UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DUNSINK TRADING, LTD.,

                                   Plaintiff,

vs.

PITSBURG FINANCIAL, INC.,,

                                   Defendant.

Civ. No.  08 c i v. V 0 11 (GBD)

---

## DECLARATION OF ANTHONY B. ULLMAN  PURSUANT TO RULE B(1)

ANTHONY B. ULLMAN declares as follows:

1.      I am a partner of Salans, counsel for Plaintiff Dunsink Trading, Ltd. ("Dunsink").

2.      This declaration is submitted pursuant to Supplemental Rule B of the Federal Rules of Civil Procedure.

3.      On May 27, 2008, I caused an investigation to be made, under my direction, by a paralegal employed by my firm, as to whether the defendant, Pitsburg Financial, Inc., can be "found" within this District for the purpose of an attachment under Rule B.  This investigation indicates that it cannot.   The parameters and scope of the investigation were as follows:

(a)      The office of the New York Department of State, Division of Corporations, was contacted, through the official Department of State website at http://www.dos.state.ny.us and a search was conducted for a company named "Pitsburg Financial, Inc."  The search result indicated that Pitsburg Financial, Inc. is not a New York corporation and it is not licensed, authorized or registered to do business in the State of New York as either a domestic or foreign corporation;

(b)     Directory Assistance for New York for area codes (212), (718), (917), (646) and (914) was contacted.  No listing for Pitsburg Financial, Inc. was found;

(c)     Through Microsoft Internet Explorer, the Internet yellow and white pages telephone directory databases  www.yellowpages.com and www.whitepages.com were accessed.  On each of those databases, a search was conducted for a listing of Pitsburg Financial, Inc. in New York.  The search did not uncover any such listing;

(d)     Using the Google search engine, a search was conducted for a website for, or listing of, Pitsburg Financial, Inc.  The search did not uncover any such website or any listing in New York.

4. Attached hereto is a copy of the Verified Complaint in this action.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 30th day of May 2008.

_____
Anthony B. Ullman

NewYork 1164429.1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT COURT OF NEW YORK



---

DUNSINK TRADING, LTD.,

                  Petitioner,

    -against-

PITSBURG FINANCIAL, INC.,

                  Respondent.

08 CIV 5011

**VERIFIED COMPLAINT**

---

Plaintiff, Dunsink Trading, Ltd. ("Dunsink"), by and through its attorneys, Salans,

respectfully alleges, as and for its Verified Complaint against Defendant, Pitsburg Financial, Inc.

("Pitsburg"), as follows:

        1.     The claims set forth herein are admiralty and maritime claims within the

meaning of Rule 9(h) of the Federal Rules of Civil Procedure Court for purposes of the

Supplemental Rules Rules for Certain Admiralty/Maritime Claims (the "Supplemental Rules").

This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1333, in

that it involves a claim for breach of a maritime time-charter contract, and an arbitral award

resulting from said breach rendered in favor of Dunsink by an arbitral tribunal established under

the rules and procedures of the Maritime Arbitration Commission at the Chamber of Commerce

and Industry of the Russian Federation (Moscow), on or about January 22, 2008 (the "Award").

This Court also has jurisdiction pursuant to 9 U.S.C. § 201, et seq., and 28 U.S.C. § 1331, in that

Dunsink seeks confirmation and enforcement of the Award, which is a foreign arbitral award

subject to the Convention on the Recognition and Enforcement of Foreign Arbital Awards (the

"New York Convention") and its implementing legislation, 9 U.S.C. §§ 201 ff.

2.    Plaintiff Dunsink is, and at all times relevant to this action was, a limited liability company organized under the laws of the British Virgin Islands.

3.    Upon information and belief, defendant Pitsburg is, and at all times relevant to this action was, a company organized under the laws of Panama.

4.    In October 2006, Dunsink (as disponent shipowner) and Pitsburg (as charterer) entered into a written maritime time-charter with respect to the vessel NIKOLAI SUTYRIN (the "Contract"). A true and correct copy of the Contract is attached as Exhibit A hereto.

5.    After the Contract was executed, Pitsburg breached its obligations under said time-charter contract by failing to pay, to Dunsink, amounts that were due and owing thereunder. On or about July 17, 2007, Dunsink, in accordance with the arbitration clause contained in Clause 42 of the Contract, submitted a request for arbitration to the Maritime Arbitration Commission at the Chamber of Commerce and Industry of the Russian Federation (Moscow) (the "MAC").

6.    An arbitral tribunal was thereafter duly constituted in Moscow.

7.    The arbitral tribunal issued its final award on or about January 22, 2008 (the "Award"). In the Award, the arbitral tribunal determined that Pitsburg breached its obligations under the Contract and awarded Dunsink the total amount of $40,089.04. A certified copy of the Award, along with a certified translation thereof, is attached as Exhibit B hereto.

8.    Despite requests, Pitsburg to date has failed to pay Dunsink any portion of the amount awarded to Dunsink under the Award.

9.    Defendant Pitsburg cannot be found within this District within the meaning of Rule B of the Supplemental Rules but, upon information and belief, has, or will have

-2-

during the pendency of this action, property within this District and subject to the jurisdiction of this Court consisting of, inter alia, cash, funds, credits, wire transfers, electronic funds transfers, accounts, monies, debts, and/or letters of credits belong to, due to or for the benefit of defendant Pitsburg, held in the hands of garnishees including, but not limited to, American Express Bank, HSBC Bank USA, Bank of New York Mellon, Barclays Bank PLC, Credit Suisse First Boston, ABN Amro Bank, N.V., BNP Paribas, Deutsche Bank Trust Co. Americas, Deutsche Bank AG, Citibank, N.A., JP Morgan Chase Bank, N.A., Wachovia Bank, Bank of America, N.A., or other banks or garnishees whose identities may subsequently become known to plaintiff or plaintiff's counsel.

10.    Pursuant to Rule B of the Supplemental Rules, Dunsink is entitled to attachment of said property, for the purpose of securing personal jurisdiction over Pitsburg and to secure Dunsink's claims.

11.    The total amount to be attached at this time is $ 48,089.04, comprising the following components:

(a) final arbitration award in the amount of $40,089.04;

(b) estimated interest on said award, from January 28, 2008 to date of entry of judgment thereon (see Second Claim for Relief) in the amount of $3,500; and

(c) estimated attorneys fees and expenses incurred in connection with this action in the amount of $4,500.

12.    The Award falls under the New York Convention pursuant to 9 U.S.C. § 202, in that it was made in the territory of the Russian Federation, arises out of a commercial legal relationship and is not entirely between citizens of the United States.

-3-

13.    Pursuant to 9 U.S.C. § 207, Dunsink is entitled to confirmation of the Award, in that this petition is timely made and no cognizable grounds for refusing recognition or enforcement of the Award exist.

14.    Under the controlling Federal law, Dunsink is entitled to prejudgment interest, calculated at an appropriate rate, on the Award amount.

15.    Under both Federal law and the Contract, Dunsink is entitled to its attorneys fees and costs incurred in connection with this action.

WHEREFORE, plaintiff Dunsink respectfully prays:

A. That process in due form of law according to the practice of this Court issue against defendant Pitsburg, citing it to appear and answer under oath all and singular the matters alleged in the Verified Complaint;

B. That, since defendant Pitsburg cannot be found in this District within the meaning of Rule B of the Supplemental Rules, this Court issue an Order directing the Clerk of the Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules, attaching all cash, accounts, credits, letters of credit, debts, monies, wire transfers and electronic funds transfers, tangible or intangible, or any other funds held by any garnishee, including but not limited to American Express Bank, HSBC Bank USA, Bank of New York Mellon, Barclays Bank PLC, Credit Suisse First Boston, ABN Amro Bank, N.V., BNP Paribas, Deutsche Bank Trust Co. Americas, Deutsche Bank AG, Citibank, N.A., JP Morgan Chase Bank, N.A., Wachovia Bank and/or Bank of America, N.A., which belong to, or are due and owing to, Pitsburg, in the amount of $48,089.04 calculated to date to secure Dunsink's claims, and that all persons claiming any interest in the same be cited to appear and, pursuant to Rule B of the Supplemental Rules, answer the matters alleged in the Verified Complaint;

-4-

C.  That this Court, pursuant to the New York Convention and 9 U.S.C. § 207, enter an Order (1) confirming the Award and granting judgment in favor of Dunsink against Pitsburg in the amount of $40,089.04 and (2) awarding Dunsink prejudgment interest from January 28, 2008 through the date of entry of judgment at the rate of 9.0% on the above-stated amount;

D.  That this Court award Dunsink its costs, including attorneys' fees, in this proceeding;

E.  That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims set forth herein, or which mat be initiated in the future, including any appeals thereof; and

F.  That this Court grant Dunsink such other and further relief as the Court may deem just and proper.

Dated: New York, New York
       May 30, 2008

SALANS

By: _____
    Anthony B. Ullman
    Rockefeller Center
    620 Fifth Avenue
    New York, New York 10020
    212-632-5500
    Attorneys for Dunsink Trading, Ltd.

-5-

## VERIFICATION

KONSTANTIN PURIM declares as follows:

1.    I am a Director of Dunsink Trading, Ltd., the plaintiff herein.

2.    I have read the foregoing Verified Complaint and know the contents thereof, and believe the same to be true and accurate to the best of my knowledge, information and belief.

3.    Concerning, in particular, Paragraph 9 of the foregoing Verified Complaint, to the best of my knowledge, information and belief, the defendant Pitsburg Financial, Inc. is not found within the Southern District of New York, in that it is a Panamanian company and does not have any offices, personnel or representatives in New York.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 29 th day of MAY, 2008.

_____
Konstantin Purim

CODE-NAME: "BALTIME 1939"    PART I

| | |
|---|---|
| 2. Place and date , Moscow October 26th 2006 | |
| 3. Owners / Place of business<br>«DUNSINK TRADING Ltd»<br>Trident Chambers, P.O.Box 146, Road Town,<br>Tortola, British Virgin Islands<br>(as disponent shipowner) | 4. Charterers /Place of business<br>" PITSBURG FINANCIAL INC" Ricardo Arias Street,<br>Advanced Tower, 11th floor, Suite B,Panama City,<br>Panama. |
| 5. Vessel's name<br>mv «NIKOLAY SUTYRIN» | 6. GRT / NRT<br>2481 / 1081 |
| 7. Class<br>KM ☉ L4 1 IISP, Flag - Mongolian | 8. Indicated horse power<br>1134 kW |
| 9. Total tons d.w. (abt.) on Board of Trade summer freeboard<br>3355 MTS | 10. Cubic feet grain/bale capacity<br>4306,90m3 |
| 11. Permanent bunkers (abt.)<br>motoroil 0,5-1,5 mts, dieseloil 60 mts | |
| 12. Speed capability in knots (abt.) on a consumption in tons (abt.) of (at the moment of delivery of the Vessel):<br>abt 8,0 knots on max 4,0 mts MDO p.d. | |
| 13. Present position<br>TRADING | |
| 14. Period of hire (Cl. 1)<br>6 months plus 6 further months to be<br>mutually agreed, each period 15 days M.O.L.<br>at Owners option. | 15. Port of delivery (Cl. 1)<br>1 SP AZOV-BLACK SEA RGE, INCL. TURKISH PART OF<br>BLACK SEA, IN OWS' OPTION, ATDNSHINC |
| | 16. Time of delivery (Cl. 1)<br>05/11/06 – 10/11/06 |
| 17. (a) Trade limits (Cl. 2)<br>  See Add.Cl. 31 | |
| 18. Bunkers on re-delivery (state min. And max. quantity) (Cl. 5)<br>Quantity of Bunkers on re-delivery to be same as on delivery min 40 mt. /max 70mt | |
| 19. Charter hire (Cl. 6)<br>USD 2,250 (Two thousand and two hundred<br>fifty US Dollars) net per day,<br>pro rata incl. O/T, payable every 15 days in<br>advance. | 20. Hire payment (state currency, method and place of payment; also<br>beneficiary and bank account) (Cl. 6)<br>US Dollars (See clause 29) |
| 21. Place or range of re-delivery<br>Dropping outward last seaport pilot (or if no<br>pilot taken adequate distance) 1 safe port<br>Azov/ Black sea/Marmara in Charteters<br>option | 22. War (only to be filled in if Section (C) agreed) (Cl. 21) |
| 23. Cancelling date (Cl. 22)<br>10th November 2006 | 24. Place of arbitration (only to be filled in if place other than London agreed) (Cl. 23)<br>Clause 42 |
| | 25. Numbers of additional clauses covering special provisions, if agreed<br>Cl.26 – Cl.46 |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include Part I as well as Part II. In the event of a conflict of conditions, the provisions of Part I shall prevail over those of Part II to the extent of such conflict.



| Signature (Owners) | Signature (Charterers) |
|---|---|

PART II

## "BALTIME 1939" Uniform Time - Charter (Box Layout 1974)

It is agreed between the party mentioned in Box 3    1
as Owners of the Vessel named in Box 5 of the    2
gross/net Register tonnage indicated in Box 6,    3
classed as stated in Box 7 and of indicated horse    4
power as stated in Box 8, carrying about the    5
number of tons deadweight indicated in Box 9 on    6
Board of Trade summer freeboard inclusive of bun-    7
kers, stores, provisions and boiler water, having, as    8
per builder's plan a cubic-feet, grain/bale capacity    9
as stated in Box 10, exclusive of permanent bun-    10
kers which contain about the number of tons    11
stated in Box 11, and at delivery fully loaded capable of    12
steaming about the number of knots indicated in    13
Box 12 in good weather and smooth water on a    14
consumption of about the number of tons best    15
Welsh coal or oil-fuel stated in Box 12, now in    16
position as stated in Box 13 and the party men-    17
tioned as Charteres in Box 4, as follows:    18

**1.**   Period/Port of Delivery/Time of Delivery    19
The Owners let, and the Charterers hire the Ves-    20
sel for a period of the number of calendar months    21
indicated in Box 14 from the time ~~(not a Sunday~~    22
~~or a legal Holiday unless taken-over)~~ the Vessel    23
is delivered and placed at the disposal of the    24
Charterers ~~between 9 a.m. and 6 p.m., or between~~    25
~~a.m. and 2 p.m. if on Saturday,~~ at the port    26
stated in Box 15, in such available berth where    27
she can safely lie always afloat, as the charterers    28
may direct, she being in every way fitted for or-    29
dinary cargo service.    30
The Owners should give to the Charterers 3 and 1   
days notice of delivery.  The Vessel be delivered    31
at the time indicated in Box 16.    32

**2.**   Trade    33
The Vessel to be employed in lawful trades for    34
the carriage of lawful merchandise only between    35
good and safe ports or places where she can    36
safely lie always afloat within the limits stated in    37
Box 17.    38
No live stock nor injurious, inflammable or dan-    39
gerous goods (such as acids, explosives, calcium    40
carbide, ferro silicon, naphtha, motor spirit, tar,    41
or any of their products) to be shipped.    42

**3.**   Owners to Provide    43
The Owners to provide and pay for all provisions    44
and wages, for insurance of the Vessel, for all    45
deck and engine-room stores and maintain her in    46
a thoroughly effecient state in hull and machinery    47
during service.    48
~~The Owners to provide one winchman per hatch.~~    49
~~If further winchmen are required, or if the steve-~~    50
~~dores refuse or are not permitted to work with~~    51
~~the Crew,~~ the Charterers to provide and pay    52
qualified shore-winchmen.    53

**4.**   Charterers to provide    54
Without limitations to the foregoing, the Charterers to    55
provide and pay for all coals including galley coal, oil-fuel,    56
water for boilers,port charges, pilotages (whether    57
compulsory or not) canal steersmen, boatage, lights,    58
tug-assistance, consular charges (except those pertaining    59
to the Master, Officers and Crew), canal, dock and    60
other dues and charges, including any foreign    61
general municipality or state taxes, also all dock,    62
harbour and tonnage dues at the ports of de-    63
livery and re-delivery (unless incurred through    64
cargo carried before delivery or after re-delivery),    65
agencies, commisions, also to arrange and pay    66
for loading, trimming, stowing (including dunnage    67
and shifting boards excepting any already on    68
board), unloading, weighing, tallying and delivery    69
of cargoes, surveys on hatches, meals supplied to    70
officials and men in their service and all other    71
charges and expenses whatsoever including de-    72
tention and expenses through quarantine (includ-    73

ing cost of fumigation and disinfection).    74
All ropes, slings and special runners actually    75
used for loading and discharging and any special    76
gear, including special ropes, hawsers and chains    77
required by the custom of the port for mooring    78
to be for the Charterer's account. ~~The Vessel to~~    79
~~be fitted with winches, derricks, wheels and or-~~    80
~~dinary runners capable of handling lifts up to 2 tons.~~    81
   82

**5.**   Bunkers (see also clause 30)    83
The Charterers at port of delivery and the Own-    84
ers at port of re-delivery to take over and pay    85
for all coal or oil-fuel remaining in the Vessel's    86
bunkers at current price at the respective ports.    87
The Vessel to be re-delivered with not less than    88
the number of tons and not exceeding the num-    89
ber of tons of coal or oil-fuel in the Vessel's    90
bunkers stated in Box 18.    91

**6.**   Hire    92
The Charterers to pay as hire the rate stated in    93
Box 19, commencing in accordance    94
with Clause 1, until her re-delivery to the Owners.    95
Payment (see Rider clause 29)    96
Payment of hire to be made ~~in cash,~~in the currency stated    97
in Box 20, without any discount or deduction, every    98
15 days, in advance, and in the manner prescribed    99
in Box 20. In default of payment the    101
Owners to have the right of withdrawing the Vessel from    102
the service of the Charterers, without noting any protest    103
and without interference by any court or any other    104
formality whatsoever and without prejudice to    105
any claim the Owners may otherwise have on the    106
Charterers under the Charter.   

**7.**   Re-delivery    108
The vessel to be re-delivered on the expiration    109
of the charter in the same good order as when    110
delivered to the Charterers (fair wear and tear    111
excepted) at an ice-free port in the Charterers'    112
option at the place or within the range stated in    113
Box 21. ~~between 9 a.m. and 6 p.m. and 9 a.m.~~    114
~~and 2 p.m. on Saturday, but the day of re-delivery~~    115
~~shall not be a Sunday or legal Holiday.~~    116
~~Notice~~    117
The Charterers to give the Owners not less than    118
15/7/5/3/2 and 1 days' notice at which port and on    119
about which day the Vessel will be re-delivered.    120
Should the Vessel be ordered on a voyage by    121
which the Charter period will be exceeded the    122
Charterers to have the use of the Vessel to    123
enable them to complete the voyage, provided it    124
could be reasonably calculated that the voyage    125
would allow re-delivery about the time fixed for    126
the termination of the Charter, but for any time    127
exceeding the termination date the Charterers to    128
pay the market rate if higher than the rate stipu-    129
lated herein.    130

**8.**   Cargo Space    131
The whole reach and burthen of the Vessel, in-    132
cluding lawful deck-capacity to be at the Char-    133
terers' disposal, reserving proper and sufficient    134
space for the Vessel's Master, Officers, Crew,    135
tackle, apparel, furniture, provisions and stores.    135

**9.**   Master    137
The Master to prosecute all voyages with the ut-    138
most despatch and render customary assist-    139
ance with the Vessel's Crew. The Master to be    140
under the orders of the Charterers as regards    141
employment. agency, or other arrangements. The    142
Charterers to indemnify the Owners against all    143
consequences or liabilities arising from the Ma-    144
ster, Officers or Agents signing Bills of Lading    145
or other documents or otherwise complying with    146
such orders, as well as from any irregularity in    147
the Vessel's papers or for overcarrying goods    148

The Owners not to be responsible for shortage, 149
mixture, marks, nor for number of pieces or 150
packages nor for damage to or claims on cargo 151
caused by bad stowage or otherwise 152
If the Charterers have reason to be dissatisfied 153
with the conduct of the Master, Officers or En- 154
gineers, the Owners, on receiving particulars or 155
the complaint, promptly to investigate the matter, 156
and if necessary and practicable, to make a 157
change in the appointments. 158

**10. Directions and Logs** 159
The Charterers to furnish the Master with all in- 160
structions and sailing directions and the Master 161
and Engineer to keep full and correct logs ac- 162
cessible to the Charterers or their Agents. 163

**11. Suspension of Hire, etc.** 164
(A) In the event of drydocking or other necessary 165
measures to maintain the efficiency of the Ves- 166
sel, deficiency of men or Owners' stores, break- 167
down of machinery, damage to hull or other ac- 168
cident (which take place on the Owners' 
negligence), either hindering or preventing the work- 169
ing of the Vessel and continuing for more than 170
twenty four consecutive hours, no hire to be paid 171
in respect of any time lost thereby during the 172
period in which the Vessel is unable to perform 173
the service immediately required. Any hire paid '74
in advance to be adjusted accordingly. 175
(B) In the event of the Vessel being driven into 176
port or to anchorage through stress of weather, 177
trading to swallow harbours or to rivers or ports 178
with bars or suffering and accident to her cargo, 179
any detention of the Vessel and/or expenses re- 180
sulting from such detention to be for the Char- 181
terers' account even if such detention and/or ex- 182
penses, or the cause by reason of which either 183
is incurred, be due to, or be contributed to 184
by the negligence of the Owners' servants. 185

**12. Cleaning Boilers** 186
Cleaning Boilers whenever possible to be done 187
during service, but if impossible the Charterers 188
to give the Owners necessary time for cleaning 189
Should the Vessel be detained beyond 48 hours 190
hire to cease until again ready 191

**13. Responsibility and Exemption** 192
The Owners only to be responsible for delay in 193
delivery of the Vessel or for delay during the 194
currency of the Charter and for loss or damage 195
to goods onboard, if such delay or loss has been 196
caused by want of due diligence on the part of 197
the Owners or their Manager in making the Ves- 198
sel seaworthy and fitted for the voyage or any 199
other personal act or mission or default of the 200
Owners or their Manager. The Owners not to be 201
responsible in any other case nor for damage or 202
delay whatsoever and howsoever caused even if 203
caused by the neglect of default of their ser- 204
vants. The Owners not to be liable for loss or 205
damage arising or resulting from strikes, lock- 206
outs or stoppage or restraint of labour (including 207
the Master, Officers or Crew) whether partial or 208
general. 209
The Charterers to be responsible for loss or damage 210
caused to the Vessel or to the Owners by goods being 211
loaded contrary to the terms of the Charter or by 212
improper or careless bunkering or loading, stowing or 213
discharging of goods or any other improper or negligent 214
act on their part or that of their servants. 215
216

**14. Advances** 217
~~The Charterers or their Agents to advance to the~~ 218
~~Master, if required, necessary funds for ordinary~~ 219
~~disbursements for the Vessel's account at any~~ 220
~~port without any interest charging only interest at 6 per~~ 221
~~cent. p.a. such advances to be deducted from hire.~~ 222

**15. Excluded Ports** 223
The Vessel not to be ordered to nor bound to 224
enter: a) any place where fever or epidemics are 225
prevalent or to which the Master, Officers and 226
Crew by law are not bound to follow the Vessel. 227
Ice 228
b) any ice-bound place or any place where lights, 229
lightships, marks and buoys are or likely to 230
be withdrawn by reason of ice on the vessel's 231
arrival or where there is risk that ordinarily the 232
Vessel will not be able on account of ice to 233
reach the place or to get out after having com- 234
pleted loading or discharging. The Vessel not to 235
be obliged to force ice. If on account of ice the 236
Master considers it dangerous to remain at the 237
loading or discharging place for fear of the Ves- 238
sel being frozen in and/or damaged he has 239
liberty to sail to a convenient open place and 240
await the Charterers' fresh instructions. 241
Unforeseen detention through any of above cau- 242
ses to be for the Charterer's account. 243

**16. Loss of Vessel** 244
Should the Vessel be lost or missing, hire to 245
cease from the date when she was lost. If the 246
date of loss cannot be ascertained half hire to 247
be paid from the date the Vessel was last re- 248
ported until the calculated date of arrival at the 249
destination. Any hire paid in advance 250
to be adjusted accordingly. 251

**17. Overtime** 252
The Vessel to work day and night if required. 253
The Charterers to refund the Owners their out- 254
lays for all overtime paid to Officers and Crew 255
according to the hours rates and stated in the 256
Vessel's articles. 257

**18. Lien** 258
The Owners to have a lien upon all cargoes, bunkers 259
and sub-freights belonging to the Time-Charterers 260
any Bill of Lading freight for all claims under 261
this Charter, and the Charterers to have not any lien 262
on the Vessel for all moneys paid in advance 263
and not earned. The Charterers will not directly or 264
indirectly suffer, nor permit to be continued, any lien
and/or encumbrance and/or arrests, which might have priority
over the title and interest of the Owners in the Vessel.

**19. Salvage** 265
All salvage and assistance to other vessels to be 266
for the Owners' and the Charterers' equal benefit 267
after deducting the Master's and Crew's propor- 268
tion and all legal and other expenses including 269
hire paid under the Charter for time lost in the 270
salvage, also repairs of damage and coal or oil- 271
fuel consumed. The Charterers to be bound by 272
all measures taken by the Owners in order to 273
secure payment of salvage and fix its amount. 274

**20. Sublet** 275
The Charterers to have the option of subletting 276
the Vessel, subject to the Owners' prior approval
which shall not be unreasonably withheld, upon
giving due notice in writing to the Owners, but 277
the original Charterers always to remain respon- 278
sible to the Owners for due performance of the 279
Charter and contractors and agents of subcharters
shall be deemed contractors and agents of the

III

TIME-CHARTER dated 30th October 2006   (m/v «NIKOLAY SUTYRIN»)
between   «Dunsink Trading Ltd» (the Owners)   and   «Pitsburg Financial Inc.» (the Charterers)

**Clause 27. Time-charter particulars.**

(a) On vessel's redelivery the Charterers shall perform the last hold cleaning for their account. All and any intermediate hold cleaning will be only for the Charterers account. If assistance of crew for such cleaning will be required, the Charterers should pay USD 300 per every cleaning operation in all holds to the crew as fee for such assistance. The Charterers are to send a written request to the Owners for every cleaning operation.

Such fee should be paid with the nearest hire payments. Vessel's delivery/redelivery to be ascertained by a certificates duly signed by Master and Charterers' appointed surveyor or representative.

(b) Delivery/redelivery time for purpose of calculating hire to be based on local (Moscow) time.

(c) Charterers' agent to perform minor Owners' matters at load and discharge ports and at ports of transit. Owners shall reimburse Charterers actual costs (but not agency fee) inclined by Charterers agents from undertaking such minor matters. And In each such case, the Owners are prior to give a written request to Charterers. Owners have options to appoint protective agents. For the purpose of internal Owners' ISM code procedure, the Charterers shall advise to the Owners full stile of agents in ports of loading,discharging and transit agents not later then 1 day prior to arrival .

(d) The Owners have the right to take the vessel out of the service at any time for emergency repairs, and for routine maintenance (including dry-docking) by prior notification to the Charterers.

**Clause 28. Acceptance of delivery and acceptance of redelivery.**

(a) Acceptance of delivery of the Vessel by the Charterers shall not prejudice their rights against the Owners under this Charter.

(b) Acceptance of redelivery of the Vessel by the Owners shall not prejudice their rights against the Charterers under this Charter.

(c) A joint on/offhire survey to be conducted on delivery/redelivery of the vessel. Each party to appoint one surveyor at their own time/expense. Owners have the right to appoint their own master as surveyor.

**Clause 29. Payments (see also clause 6).**

(a) Hire and other payment under this Charter to be made by the Charterers to Owners' nominated account:

    BENEFICIARY: Dunsink Trading Ltd.
    ACCOUNT: 020600P02729560 0000
    BENEFICIRY'S BANK: UBS AG, Zurich,Switzerland
    SWIFT: UBSWCHZH80V
    HIRE PAYMENT DETAILS: m/v «N.SUTYRIN» C/P DD 26.10.06   time-charter hire

                                *(please state period of hire for which this payment is made)*

(b) First payment of hire and value of bunker on delivery to be paid within 3 (three) banking days upon Vessel's delivery.

(c ) First payment of hire to be paid for 15 ( fiveteen) days of hire in advance, to be paid within 3 (three) banking days upon Vessel's delivery, thereafter, every 15 days in advance.

(d) The Charterers shall pay cables/victualing/Master's entertainment – USD 200.00 (two hundred) per month along with hire payment. Bunkers (MDO) whilst on hire to be for the Charterers' account.

(e) Hire rate US Dollars 2250,00 net per day and pro rata including over time, luboil and fresh water expenses is to be for Owners account.

(g)The Charterers are not allowed to deduct any expenditures from the hire. All the expenses which are for the Owner's account to be reimbursed to the Chrterers by Owners against a separate invoice issued by Charterers, which is to be settled within 2 banking days after the receipt of invoice in copy by fax or e-mail.



TIME-CHARTER dated 30th October 2006 (m/v «NIKOLAY SUTYRIN»)
Case 1:08-cv-05011-GBD   Document 6-2   Filed 06/03/2008   Page 5 of 10
between «Dunsink Trading Ltd» (the Owners)   and   «Pitsburg Financial Inc.» (the Charterers)

# RIDER CLAUSES

Clause 26. Vessel's particulars (all figures are about and without guaranty)

MV "NIKOLAY SUTYRIN"

Pandi covered by Russian P&I Pool.
Hull and Machinery insured by ROSNO Insurance with value USD 800.000,-

Type – "Sormovsky", river sea going vessel, singledecker, gearless, double skinned, steel floored.
Flag:           Mongolian
Class:          KM(*)L4[1] I I SP
Built:          1971/renovated 1996

Call sign:      JVXM2
IMO number:     7119460
INMARSAT:       457499000

Deadweight          3355 tons
Displacement        4626 tons
Grain/bale capacity 4306.90m3
GRT/NRT             2481/1081
LOA /Length /beam       114.2 /107,5 / 13 m
Sea Draft (fully laden) 3,81 m
Sea Draft (fully laden)/ Weight carrying capacity     3,81 m/abt.3000 tons

4 holds  1) 17,60 x 10,90 narrowing upto 5,5 m = 954,7 m3
         2) 19,80 x 10,90 narrowing upto 5,5 m = 1144,50 m3
         3) 19,80 x 10,90 narrowing upto 5,5 m = 1144,50 m3
         4) 18,15 x 10,90 narrowing upto 5,5 m = 1063,20 m3
4 hatches No.1 - 17,6 x 9,35 m, No.2,3,4 – 18,15 x 9,35 m
Max pressure on holds deck/hatches 4.5 tpsm/1.75 tpsm
P&I covered by Russian P&I Pool management by
Zeller Associates Gmbh
ISM,DOC,ISPS available
All figures abt,wog

Speed at seafull loaded: abt. 8 knots
Speed at sea in ballast      abt. 8 knots
Speed at sea data are relevant for wind force to Beaufort 3 scale.

CONSUPMTION:    max 4,0 MT MDO daily steaming
                Abt.0,4 MT MDO daily idle (April-October)
                Abt.0,6 MT MDO daily idle (October-April)

Vessel is burning Marine Diesel Oil with max 0,5 % sulphur
All figures are about and without guaranty

Vessel has all relevant papers on board and all marks are clearly visible, fore, amidhsip and aft to conduct a proper draft survey.

TIME CHARTER dated 30th October 2006 (m/v «NIKOLAY SUTYRIN»)
between «Dunsink Trading Ltd» (the Owners) and «" Pitsburg Financial Inc." » (the Charterers)
Case 1:08-cv-05011-GBD    Document 6-2    Filed 06/03/2008    Page 6 of 10

Charterers for all the purposes of this Charter.    280

21. War    281
(A) The Vessel unless the consent of the Owners    282
be first obtained not to be ordered nor continue    283
to any place or on any voyage nor be used on    284
any service which will bring her within a zone    285
which is dangerous as the result of any actual    286
or threatened act of war, war hostilities, warlike    287
operations, acts of piracy or of hostility or ma-    288
licious damage against this or any other vessel    289
or its cargo by any person, body or State what-    290
soever, revolution, civil war, civil commotion or    291
the operation of international law, nor be ex-    292
.posed in anyway to any risk or penalties whatso-    293
ever consequent upon the  imposition of Sanc-    294
tions, nor carry any goods that may in any way    295
expose her to any risks of seizure, capture, pe-    296
nalties or any other interference of any kind    297
whatsoever by belligerent or fighting powers    298
or parties or by any Government or Ruler.    299
(B) Should the Vessel approach or be brought or    300
ordered within such zone or be exposed in any    301
way to the said risks, (1) the Owners to be en-    302
titled from time to time to insure their interests    303
in the Vessel and/or hire against any of the risks    304
likely to be involved thereby on such terms as    305
they shall think fit, the Charterers to make a re-    306
fund to the Owners of the premium on demand;    307
and (2) notwithstanding the terms of Clause 11    308
hire to be paid for all time lost including any    309
lost owing to loss of or injury to the Master,    310
Officers, or Crew or to the action of the Crew in    311
refusing to proceed to such zone or to be ex-    312
posed to such risks.    313
(C) In the event the wages of the Master , Of-    314
ficers and/or Crew or the cost of provisions and/    315
or stores for deck and/or engine room and/or    316
insurance premium being increased by reason    317
of or during the existence of any of the matters    318
mentioned in section (A) the amount of any in-    319
crease to be added to the hire and paid by the    320
Charterers on production of the Owners' account    321
therefore, such account being rendered monthly.    322
(D) The Vessel to have liberty to comply with    323
any orders or directions as to departure, arrival,    324
routes, ports of call, stoppages, destination, de-    325
livery, or any other wise whatsoever given by    326
the Government of the nation under whose flag    327
the Vessel sails or any other Government or any    328
person (or body) acting or purporting to act with    329
the authority of such Government or by any com-    330
mittee or person having under the terms of the    331
war risks insurance on the Vessel the right to    332
give any such orders or direction.    333
(E) In the event of the nation under whose flag    334
the Vessel sails becoming involved in war, ho-    335
stilities, warlike operations, revolution, or civil    336

commotion, both the Owners and the Charterers    337
may cancel the Charter and, unless otherwise    338
agreed the Vessel to be re-delivered to the Ow-    339
ners at the ports of destination or, if prevented    340
through the provisions of section (A), from reach-    341
ing or entering it, then at a near open and safe    342
port at the Owners' option, after discharge of any    343
cargo on board.    344
(F) If in compliance with the provisions of this    345
clause anything is done or is not done, such not    346
to be deemed a deviation.    347
*Section (C) is optional and should be considered*    348
*deleted unless agreed according to Box 22.*    349

22. Cancelling    350
Should the Vessel not be delivered by the date    351
indicated in Box 23, the Charterers to have the    352
option of cancelling.    353
If the Vessel cannot be delivered by the cancel-    354
ling date, the Charterers, if required, to declare    355
within 48 hour after receving notice thereof    356
whether they cancel or will take delivery of the    357
Vessel.    358

23. Arbitration (see clause 39)    359
~~Any dispute arising under the Charter to be re-~~    360
~~ferred to arbitration in London (or such other~~    361
~~place as may be agreed according to Box 24)~~    362
~~one Arbitrator to be nominated by the Owners~~    363
~~and the other by the Charterers, and in case the~~    364
~~Arbitrators shall not agree then to the decision~~    365
~~of an umpire to be appointed by them, the award~~    366
~~of the Arbitrators or the Umpire to be final and~~    367
~~binding upon both parties.~~    368

24. General Average    369
General Average to be adjusted and settled in    
London according to York-Antwerp Rules, 1974.    370
Hire not to contribute to General Average.    371
Adjuster will be appointed by the Owners.    372

25. Commission    373
The Charterers to pay a commission at the rate    374
stated in Box 25 to the party mentioned in Box    375
25 on any hire paid under the Charter, but in no    376
case less than is necessary to cover the actual    377
expenses of the Brokers and a reasonable fee    378
for their work. If the full hire is not paid owing    379
to breach of Charter by either of the parties the    380
party liable thereto to indemnify the Brokers    381
against their loss of commission.    382
Should the parties agree to cancel the Charter,    383
the Charterers to indemnify the Brokers against any    384
loss of commission but in such case the com-    385
mission not to exceed the brokerage on one    386
year's hire.    387



Case 1:08-cv-05071-GBD Document 8-2 Filed 06/03/2008 Page 7 of 10
TIME CHARTER dated 30th October 2006 (mdv «NIKOLAY SUTYRIN»)
between «Dunsink Trading Ltd» (the Owners) and «" Pitsburg Financial Inc." » (the Charterers)

**Clause 30. Bunker clause (see also clause 5).**

(a) Charterers are to bunker the vessel either prior the commencement of the time charter period (upon Owners reconfirmation) or within the period of Time Charter. Price of bunker on delivery will be paid by the Charterers to the Owners at the price of last bunkeringbefore delivery as per respective bunker invoice/bunker receipt ( to be enclosed) in accordance with cl.29(b) of the Present charter. The quantity of bunker remained on board on redelivery will be reimbursed by the Owners at the price of last bunkering by Charterers just upon redelivery as per respective bunker invoice/bunker receipt (to be enclosed).

(b) For the purpose of internal Owners' ISM code procedure, the Charterers shall advise to the Owners full stile of suppliers and agents not later then 2 (two days) days prior to the bunkering/supply of the vessel which performs for the Charterers account. The bunker and lub-oils shall be of a stable and homogeneous nature and shall comply with ISO standard 8217: 1996 or any subsequent amendments thereof as well as with the relevant provisions of MARPOL. The Chief Engineer shall have rights, including but not limited to checking, verifying and acknowledging sampling, readings or soundings, meters etc. before, during and/or after delivery of the bunker and/or lub-oils. The Chief Engineer, also have the rights to submit the samles of bunker duly sealed and stamped by bunker supply company, during every bunkering, to the laboratory for analysis and the Charterers are liable to pay for such laboratory expenses and send the analysis report to the Owners

(c) The Charterers shall be liable for any loss or damage to the owners caused by the supply of unsuitable bunker and/or lub-oils and the Owners shall not be held liable for any reduction in the Vessel's speed performance and/or increased bunker and/or lub-oils consumption nor for any time lost and any other consequences arising as a result of such supply.

**Clause 31. – Trade limits, cargoes exlusion**

(a) T/C VIA SP(s), SB(s), SA, AAAA, AWIWL Azov, Black, Marmara, Ionian, Aegean, Adriatic, Caspian, Baltic, Mediterranean Seas and Russian inland waterway systems as per vessel's class and register documents.

Excluding: all place which are out of abovementioned trade limits, including, but not limited: Lebanon, Libya, Syria, Israel, Turkish Occupied Cyprus, and/or war and/or war-risk zones.

If vessel will be found as blacklisted same to be for Owner's account in case Charterers and/or country and/or cargo are found blacklisted same to be for Charterer's account.

(b) Cargo exclusions specially agreed

Livestock, pitch in bulk, sulphur, fero silicon, nuclear isotopes, H.B.I., cement in bulk, bulk borax, all kind of acid any products associated with direct reduced iron, asphalt, , weapons, arms and ammunitions, creosoted goods, petroleum or its products, petcoke, cakes, pyrites, calcium hydroxide, nuclear materials, expellers, inflammable and dangerous goods, mahogany logs, and other harmful, dangerous, injurious, contraband or any unlawful cargoes. Non IMO cargoes. No cargo allowed for shipment on deck EXCEPT SSW. For the steel scrap cargoes, non oily, no heavy weight no motorblocks, or or turnings - no pressing allowed. Loading, unloading, Lashing, securing dunnage and materials for it for Charterers time and account, always in accordance with vessel description, stability, trim and permissible strenghth/weight, limit drafts,etc. The Charterers must provide the securing materials approved by the Russian Register.

**Clause 32. Charterers' obligations (in addition to any other express and/or implied conditions of this Charter).**

(a) (b) The Charterers undertake that during the period of this Charter party, they will not procure any supplies or necessaries or services, including any port expenses and bunkers, on the credit of the Owners and/or of the Vessel and that the furnisher claims no marine lien on the Vessel therefore.

(b) The Charterers, their directors, shareholders and beneficiaries shall also be liable to the Owners for any losses, damages, expenses, fines, penalties or claims which the Owners may incur or suffer by reason of the cargo or the documentation relating thereto failing to comply with any relevant laws, regulations, directions of notices of port authorities and/or any other authorities and/or any other breach any conditions and/or warranties by the Charterers.

VII



Case 1:08-cv-05011-GBD   Document 6-2   Filed 06/03/2008   Page 8 of 10
TIME CHARTER dated 30th October 2006 (m/v «NIKOLAY SUTYRIN»)
between «Dunsink Trading Ltd» (the Owners) and «" Pitsburg Financial Inc."» (the Charterers)

### Clause 33. Deviation clause.

With the exceptions of clause 11(B) should the vessel unreasonable deviate or put back while on voyage for cause or for purpose for which the Owners' are solely liable the hire shall be suspended from the time of her deviation or putting back until she is again in the same position or an equidistant one to be agreed and voyage to be resumed there from.

### Clause 34. Fumigation clause.

Fumigation for cargo (if any) take place at port only, all transportation/accommodation/lodging fee to be for Charterers account. Charterers have liberty to fumigate the cargo on board at loading and discharging ports or places en route at their risk and expense. Charterers are responsible for ensuring that Officers and Crew as well as other persons on board the vessel during and after fumigation are not exposed to any health hazards whatsoever. Charterers undertake to pay all necessary extra expenses incurred because of fumigation

### Clause 35. Stevedoring damage.

(a) Notwithstanding anything contained herein to the contrary, the Charterers shall pay for any and all damage to the Vessel caused by stevedores provided the Master has notified the Charterers and/or their agents and/or stevedores in writing as soon as practical but not later than 24 working hours after any damage is discovered.

(b) In case of any and all damage affecting the Vessel's seaworthiness and/or the safety of the crew and/or affecting the trading capabilities of the Vessel, the Charterers shall immediately arrange for repairs of such damage at their expenses and the Vessel is to remain on hire until such repairs are completed and if required passed by the Vessel's classification society. Any and all other damage shall be repaired as soon as possible at the Charterers' expenses.

### Clause 36. Crew clause.

(a) Crew to open and close hatches as and when required for stevedores loading and discharging operations provided local regulations allow same. During the currency of this Charter officers and crew will perform the customary services in respect of preparing the vessel for loading/unloading of the cargo in due same diligent manner as and if trading for their Owners' account.

(b) Any delay in connection with smuggling by crew to be for Owners' account.

### Clause 37. Anti-drug and other illegal substances clause.

(a) The Charterers warrant to exercise the highest degree of care and diligence in preventing narcotic drugs and/or any other illegal substances being loaded or concealed on board the Vessel. Non-compliance with the provisions of this Clause shall amount to breach of warranty for the consequences of which the Charterers shall be liable and shall hold the Owners, the Master and the crew of the Vessel harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them individually or jointly. Furthermore, all time lost and all expenses incurred, including fines, as a result of the Charterers' breach of the provisions of this Clause shall be for the Charterers' account and the Vessel shall remain on hire. Should the Vessel be arrested as a result of the Charterers' non-compliance with the provisions of this Clause, the Charterers shall at their expense take all reasonable steps to secure that within a reasonable time the Vessel is released and at their expense post bail to secure release of the Vessel. --

(b The Charterers are obliged to keep and care for the cargo at loading and discharging ports; to be responsible for the stevedoring operations; to arrange any transshipment and properly deliver cargoes at destination; to furnish the Master with full and timely instructions; to pay any fines, taxes, charges, expenses, etc. in the event that contraband and/or unmanifested cargoes and/or drugs and/or any other illegal substances found in cargoes.

TIME-CHARTER dated 30th October 2006, (m/v «NIKOLAY SUTYRIN»)
between   «Dunsink Trading Ltd» (the Owners)   and   «" Pitsburg Financial Inc. "» (the Charterers)

(c) The Owners shall remain responsible for all time lost and all expenses incurred, including fines, in the event that narcotic drugs and other illegal substances are found in the possession or effects of the Vessel's personnel.

## Clause 38. Supercargo.

Charterers have the liberty of placing a supercargo onboard. Owners providing him with accommodation. Charterers to pay Owners USD 10,- per day for his victualling. Supercargo to travel under Charterers insurance and under no responsibility for the Owners.

## Clause 39. Charters, Bills of Lading, Waybills, etc.

*(a) Bills of lading, waybills, etc., will be signed by Master or Charterers.' agents for and on behalf of Charterers which are Carriers. Bills of lading, waybills, etc., will be issued only in full accordance with Mate's receipt and the Master to give written authorization to Charterers' Agents for signing of the Bills of the Lading, waybills, etc., and without prejudice to the terms and conditions of this Charter. These are only the name and address of the Charterers (but not of the Owners) as Carriers to be indicated in such documents.*

*(b) Neither the Charterers nor their agents shall permit the issue of any charters. bills of lading, waybills, contract of carriage, etc. incorporating the Hamburg Rules or any other legislation giving effect to the Hamburg Rules or any other legislation imposing liabilities in excess of Hague or Hague-Visby Rules.*

( c ) General Clause Paramount, US/Canadian Clause Paramount, as applicable, *the Himalya clause*, The New Both to Blame Collision Clause and the Protection and Indemnity Bunkering Clause shall be deemed to form part of this Charter Party and shall be included in all Bills of Lading issued hereunder. BIMCO Standard War Risk Clause for Time Charters, 1993 (Conwartime 1993), BIMCO Standard ISM Clause - deemed to be incorporated in this Charter Party.

All bills of lading or waybills shall be without prejudice to this Charter Party and the Charterers shall indemnify the Owners against all consequences or liabilities which may arise from any inconsistency between this Charter Party and any bills of lading or waybills signed by the Charterers or by the Master at their request.
Bills of lading covering deck cargo shall be claused: "Shipped on deck at Charterers', Shippers' and Receivers' risk, expense and responsibility, without liability on the part of the Vessel, or her Owners for any loss, damage, expense or delay howsoever caused."

## Clause 40. Off-hire

In the event of loss of time from deficiency and/or default and/or strike of officers or crew, or deficiency of stores, ~~fire~~, breakdown of, or damages to hull, machinery or equipment, grounding, detention by the arrest of the Vessel, and other causes for which the Owners are solely liable ; the payment of hire and overtime, if any, shall cease for the time thereby lost. All bunkers used by the Vessel while off hire shall be for the Owners' account. In the event of the Vessel being driven into port or to anchorage through stress of weather, trading to shallow harbours or to rivers or ports with bars, any detention of the Vessel and/or expenses resulting from such detention shall be for the Charterers' account. If upon the voyage the speed be reduced by defect in, or breakdown of, any part of her hull, machinery or equipment,for whicg the Owners are solely liable the time so lost, and the cost of any extra bunkers consumed in consequence thereof, and reasonable extra proven expenses may not be deducted from the hire, but paid against the separate invoice provided by Charterers.

## Clause 41. Additional Clause
- OWNERS TO GUARANTEE TT VSL WILL NOT BE ARRESTED DUE TO OUTSTANDING PAYMENTS OF THIRD PARTIES INCL DEBTS TO BUNKER SUPPLY COMPANIES

### (a) Grab Discharging
The vessel shall be suitable for normal size grab discharge and Charterers shall not load cargo in places inaccessible to grab discharge. The Charterers shall have the liberty to use bulldozers with rubber tyres in the vessel's holds provided that strength of vessel's tank top permits.

IX

TIME-CHARTER dated 30th October 2006   (m/v «NIKOLAY SUTYRIN»)
between   «Dunsink Trading Ltd» (the Owners)   and   «" Pitsburg Financial Inc." » (the Charterers)

<u>(b) Hatch Waterproof Test</u>

The Charterers may order a Hose Test or Chalk Test after the delivery of the vessel and from time to time during this Charter, however, Charterers requirement shall not exceed vessel's Class rule. Costs and time of survey to be for Charterers account but the Master to give every facility to the Charterers and their Surveyor to carry out such test

Clause 42 Arbitration.

(a) In case the Parties do not come to the agreement, all disputes and differences arising out of or in connection with the present Contract, including those relating to its execution, breach, termination or invalidity, shall be referred to the Maritime arbitration commission at the Chamber of Commerce and Industry of the Russian Federation (Moscow, Russian Federation) in accordance with its Regulation and the law of the Russian Federation. The award of the this court shall be final and binding upon both Parties.

Clause 43. Notices.

Owners to give Charteres 3 and 1 days approximate and 24 hours definite Notices of Delivery. Charteres to give Owners 15 , 7 and 5 days approximate and 3 days and then 2 days and 24 hours definite Notices of Redelivery. Any notices as between the owners and the Charterers shall be in writing and sent to the addresses stated below and such other addresses as either party may designate to the other in writing.

| To the Owners | To the Charterers |
|---|---|
| Tel/fax 258-28-70<br>a-sipirin@sovfracht.ru. | charterino@pitfin.com |

Clause 44. Confidential.

All negotiations and time-charter contract to be strictly private and confidential.

Clause 45.

The each Party of the present Charter guarantees to the other party that the Vessel will not be arrested due to outstanding payments, for which such Party is liable.

Clause 46.

The full performance of the charter-party mv 'NIKOLAY SUTYRIN" dated 26th October 2006, including the responsibility and obligation of hire payment by the Charterer Messrs " PITSBURG FINANCIAL INC" Ricardo Arias Street, Advanced Tower, 11th floor, Suite B,Panama City, Panama is guaranteed by Messrs "VILIS CARGO Ltd. " 4/1, Exit 6, Luganskaya Str., Russia, Moscow, 115516 during the full period of currrent of this C/P.



X

# МОРСКАЯ АРБИТРАЖНАЯ КОМИССИЯ

## при ТОРГОВО–ПРОМЫШЛЕННОЙ ПАЛАТЕ РОССИЙСКОЙ ФЕДЕРАЦИИ

# РЕШЕНИЕ

по делу № _____ 4/2007 по иску компании «Дансинк Трейдинг Лтд.»

(Dunsink Trading Ltd.), Роуд Таун, Тортола,
Британские Виргинские острова, к компании
«Питсбург Файнэншл Инк.» (Pitsburg Financial Inc.),
Панама,  Панама, и ООО «Транспортная компания
«ВИЛИС», Москва, Россия, о взыскании
долл. США  45.088-43

Дело № 4/2007

## МОРСКАЯ АРБИТРАЖНАЯ КОМИССИЯ
### при ТОРГОВО-ПРОМЫШЛЕННОЙ ПАЛАТЕ РОССИЙСКОЙ ФЕДЕРАЦИИ

Москва                                          « 22 » января 2008 г.

### Р Е Ш Е Н И Е

по делу по иску компании «Дансинк Трейдинг Лтд.» (Dunsink Trading Ltd.), Роуд Таун, Британские Виргинские острова, к компании «Питсбург Файнэншл Инк.» (Pitsburg Financial Inc.), Панама, Панама, и ООО «Транспортная компания «ВИЛИС», Москва, Россия, о взыскании долл. США 45.088-43

Морская арбитражная комиссия в составе:
арбитров И.А. Новикова и А.Л. Маковского при докладчике Н.Е. Чарцевой в заседании 24 декабря 2007 г.

рассмотрела дело по иску компании «Дансинк Трейдинг Лтд.», Роуд Таун, Британские Виргинские острова, к компании «Питсбург Файнэншл Инк.», Панама, Панама, и ООО «Транспортная компания «ВИЛИС», Москва, Россия, о взыскании долл. США 45.088-43

и выслушала объяснения
представителя истца – И.А. Фролова (по доверенности)
Представители соответчиков, должным образом извещённых о времени и месте рассмотрения дела, в заседание не явились

### Обстоятельства дела:

17 июля 2007 г. компания «Дансинк Трейдинг Лтд.» (далее – истец) обратилась в Морскую арбитражную комиссию с иском к компании «Питсбург Файнэншл Инк.» и к ООО «Транспортная компания «ВИЛИС» (далее – соответчики) о взыскании долл. США 45.088-43. Из искового заявления и приложенных к нему документов явствовало следующее.

26 октября 2006 г. между истцом (судовладельцем) и компанией «Питсбург Файнэншл Инк.» (фрахтователем) был заключён тайм-чартер по проформе «BALTIME 1939» в отношении судна «Николай Сутырин». Судно было передано фрахтователю согласно акту приема-передачи от 05 ноября 2006 г.

2

2

30 октября 2006 г. стороны заключили дополнение к договору от 26.10.2006, которым предусмотрели, что все споры, возникающие из данного договора, передаются на рассмотрение Морской арбитражной комиссии при ТПП РФ в соответствии с её регламентом и законодательством Российской Федерации.

Условиями договора от 26.10.2006 предусмотрена обязанность фрахтователя уплачивать фрахт в размере долл. США 2.250-00 в день каждый пятнадцатый день авансом.

Кроме того, как утверждал истец, 26 октября 2006 г. путём обмена письмами между истцом и ООО «Транспортная компания «ВИЛИС» был заключён договор поручительства, в соответствии с которым указанный соответчик поручался за полное исполнение тайм-чартера со стороны компании «Питсбург Файнэншл Инк.» и обязался оплатить все её долги перед истцом и урегулировать претензии истца незамедлительно после получения письменного требования со стороны истца.

В соответствии с положениями тайм-чартера фрахтователь был обязан осуществлять первую оплату фрахта наряду с оплатой бункерного топлива, находящегося на судне, в течение 3-х банковских дней с момента принятия судна за период в 15 дней авансом, т.е. 8 ноября 2006 г. (за период с 05.11.2006 по 20.11.2006). Кроме того, фрахтователь был обязан оплачивать представительские расходы капитана в размере долл. США 200-00 ежемесячно. После первого платежа фрахт также подлежал оплате за период в 15 дней авансом, а именно:

- 20 ноября 2006 г. (за период с 20.11.2006 по 05.12.2006);
- 05 декабря 2006 г. (за период с 05.12.2006 по 20.12.2006);
- 20 декабря 2006 г. (за период с 20.12.2006 по 04.01.2007).

Истец утверждал, что ответчик – компания «Питсбург Файнэншл Инк.» свои обязательства по оплате фрахта выполнял ненадлежащим образом, в результате чего на момент подачи искового заявления задолженность ответчика перед истцом составила долл. США 34.986-51, что подтверждается счетами, выставленными судовладельцем, а также составленным судовладельцем окончательным расчётом.

По утверждению истца, первый платёж был осуществлён фрахтователем 13 ноября 2006 г. (просрочка – 5 дней), второй – частично 05.12.2006 (просрочка – 15 дней) и частично 14.12.2006 (просрочка – 24 дня), третий – 27.12.2006 (просрочка – 22 дня). Четвёртый платёж до настоящего времени фрахтователем не произведён.

Истец неоднократно направлял письма в адрес соответчиков с требованием оплатить фрахт. Соответчики, тем не менее, свои обязательства не выполняли.

29 декабря 2006 г. истец направил фрахтователю письмо с предупреждением о том, что в случае неуплаты фрахта судно будет выведено истцом из эксплуатации фрахтователя. Реализуя данное правомочие, судовладелец 06 января 2007 г. изъял судно у фрахтователя.

3

3

Помимо суммы основного долга, истец просил взыскать с соответчиков проценты за пользование чужими денежными средствами. Согласно информации, опубликованной в Вестнике Банка России № 16 (960) от 28 марта 2007 г., средние процентные ставки кредитных организаций России по краткосрочным кредитам в долларах США составляли: за ноябрь 2006 г. – 8,5% годовых (0,0236 % за день); за декабрь 2006 г. – 8,4 % годовых (0,0233% за день). Таким образом, истец утверждал, что задолженность фрахтователя по процентам за пользование чужими денежными средствами составила:

1-й платёж: долл. США 62.103-00 x 0,0236 x 5 / 100 = долл. США 73-28 (где долл. США 62.103-00 – сумма фрахта, 0,0236 – процентная ставка за один день, 5 – количество просроченных дней);

2-й платёж: - долл. США 25.000-00 x 0,0236 x 15 /100 = долл. США 88-50 (где долл. США 25.000-00 – сумма части фрахта, 0,0236 – процентная ставка за один день, 15 - количество просроченных дней);

- долл. США 8.950-00 x 0,0236 x 24 / 100 = долл. США 50-69 (где долл. США 8.950-00 – сумма части фрахта, 0,0236 - процентная ставка за один день, 24 - количество просроченных дней);

3-й платёж: долл. США 33.950-00 x 0,0233 x 22 / 100 = долл. США 174-02 (где долл. США 33.950-00 – сумма фрахта, 0,0233 - процентная ставка за один день, 22 - количество просроченных дней);

4-й платёж: долл. США 33.950-00 x 0,0233 x 196 / 100 = долл. США 1.550-43 (где долл. США 33.950-00 – сумма фрахта, 0,0233 - процентная ставка за один день, 196 - количество просроченных дней).

Итого: долл. США 1.936-92.

Кроме того, истец заключил соглашение об оказании юридических услуг по настоящему делу, в соответствии с которым, по утверждению истца, расходы истца на оплату услуг адвоката составили долл. США 8.165-00.

Учитывая изложенное, в соответствии со ст.ст. 310, 363, 395, 634 ГК РФ, ст.ст. 198, 208 КТМ РФ, п. 2 Положения о МАК, п. 3 параграфа 4, п. 1 параграфа 6 Регламента МАК, истец просил взыскать с ответчика:

- сумму основного долга в размере долл. США 34.986-51;

- проценты за пользование чужими денежными средствами в размере долл. США 1.936-92;

- расходы на ведение дела в размере долл. США 8.165-00;

- расходы по уплате арбитражного сбора в размере долл. США 1.500-00.

От соответчиков отзывы на исковое заявление не поступили.

Письмом от 24.09.2007 № 1800-4,5/1804 МАК известила истца о том, что направленные ответчику - «Питсбург Файнэншл Инк.» исковые материалы по адресу, указанному в исковом заявлении, возвращены курьерской службой с пометкой об отсутствии получателя по данному адресу, и просила уточнить адрес ответчика.

Письмом от 30.10.2007 № 1800-4/2053 МАК также известила истца, что направленные ответчику – ООО «Транспортная компания «ВИЛИС» исковые материалы по адресу, указанному в исковом заявлении, возвращены с

4

пометкой об истечении срока хранения, и просила уточнить адрес указанного ответчика.

В заседании МАК 24 декабря 2007 г. представитель истца поддержал заявленные исковые требования. Представители соответчиков в заседание не явились. Установив, что соответчики были должным образом извещены о месте и времени слушания дела, арбитры постановили рассматривать дело в отсутствие представителей соответчиков.

На вопрос арбитров о том, действует ли в настоящее время на территории Российской Федерации ООО «Транспортная компания «ВИЛИС», представитель истца пояснил, что истцом получена по запросу выписка из Единого государственного реестра юридических лиц, в соответствии с которой данная компания зарегистрирована в Москве и действует по адресу, указанному в исковом заявлении.

Арбитрами было обращено внимание на то, что истец и компания «Питсбург Файнэншл Инк.» заключили в отношении т/х «Николай Сутырин» два договора - тайм-чартер от 26 октября 2007 г. (боксовая форма) и тайм-чартер от 30 октября 2006 г. с дополнениями (Rider Clauses). На вопрос о том, к какому из названных договоров относится гарантийное письмо от 26 октября 2007 г., выданное истцу ООО «Транспортная компания «ВИЛИС», представитель истца пояснил, что истец рассматривает тайм-чартеры от 26 и 30 октября 2007 г. как единый договор, и поэтому гарантийное письмо следует толковать как относящееся к обоим тайм-чартерам.

В связи с вопросом арбитров по оплате счетов, выставлявшихся истцом фрахтователю, представитель истца подтвердил, что полностью не был оплачен четвёртый счёт (инвойс судовладельца от 21.12.2006), остальные счета были оплачены несвоевременно.

Отвечая на вопрос арбитров, что включает в себя сумма основного долга (долл. США 34.986-51), представитель истца пояснил, что эта сумма включает: фрахт за период с 20.12.2006 по 04.01.2007 (инвойс судовладельца от 21.12.2006) - долл. США 33.950-00, сумму, подлежащую выплате на представительские расходы капитану т/х «Николай Сутырин» - долл. США 411-30, а также другие расходы, которые, по мнению истца, фрахтователь обязан возместить ему.

**Мотивы решения**

Морская арбитражная комиссия, рассмотрев материалы дела и выслушав мнение представителя истца, установила следующее.

1.1. Согласно пункту 42 тайм-чартера (часть II), заключённого между истцом и компанией «Питсбург Файнэншл Инк.» 30.10.2006, все споры, возникающие из данного договора, подлежат рассмотрению Морской арбитражной комиссией в соответствии с её регламентом и законодательством Российской Федерации. Решение Комиссии является окончательным и обязывающим обе стороны.

5

В силу п. 2 Положения о МАК при ТПП РФ (Приложение II к Закону РФ «О международном коммерческом арбитраже» от 07.07.1993), п. 1 параграфа 1 Регламента МАК при ТПП РФ Комиссия разрешает споры, которые вытекают из договорных и других гражданско-правовых отношений, возникающих из торгового мореплавания.

Как находят арбитры, требование истца к компании «Питсбург Файнэншл Инк.» относится к вышеуказанным спорам и подлежит рассмотрению в МАК.

1.2. Что касается соответчика – ООО «Транспортная компания «ВИЛИС», то в деле отсутствуют доказательства, подтверждающие существование правоотношений между истцом и данным соответчиком, вытекающих из тайм-чартера от 30.10.2006, которые охватывались бы вышеуказанной арбитражной оговоркой. Из имеющегося в материалах дела гарантийного письма от 26.10.2006, выданного ООО «Транспортная компания «ВИЛИС» истцу, следует, что ООО «Транспортная компания «ВИЛИС» поручается оплатить все долги компании «Питсбург Файнэншл Инк.» перед истцом, связанные с выполнением тайм-чартера от 26.10.2006, но ничего не сказано о том, что ООО «Транспортная компания «ВИЛИС» имеет права либо несёт обязанности, связанные с выполнением тайм-чартера от 30.10.2006.

Кроме того, истцом не представлены какие-либо доказательства того, что им со своей стороны было выражено согласие на то, чтобы принять предложенное ООО «Транспортная компания «ВИЛИС» поручительство за компанию «Питсбург Файнэншл Инк.».

Поэтому, основываясь на имеющихся в деле доказательствах, Морская арбитражная комиссия не находит оснований для удовлетворения иска к ООО «Транспортная компания «ВИЛИС».

Данный вывод арбитров о недоказанности заключения договора поручительства не затрагивает право истца обратиться с иском к ООО «Транспортная компания «ВИЛИС» на основании арбитражной оговорки, содержащейся в гарантийном письме от 26.10.2006, в рамках самостоятельного арбитражного производства.

2.1. Основное требование истца заключается во взыскании с соответчиков долл. США 34.986-51. Эта сумма включает, во-первых, фрахт за эксплуатацию т/х «Николай Сутырин» за период с 20.12.2006 по 04.01.2007 - долл. США 33.950-00; во-вторых, представительские капитану т/х «Николай Сутырин» согласно тайм-чартеру от 30.10.2006 – долл. США 411-30, а также другие расходы, которые, по утверждению истца, фрахтователь был обязан возместить ему.

Как находят арбитры, требование истца к компании «Питсбург Файнэншл Инк.» в части взыскания фрахта (долл. США 33.950-00) и представительских расходов капитана (долл. США 411-30) является правомерным и подтверждается материалами дела. Что касается других расходов, то истец не представил достаточных доказательств,

6

подтверждающих обязанность компании «Питсбург Файнэншл Инк.» возместить указанные расходы истцу.

2.2. Рассмотрев просьбу истца о начислении на сумму задолженности по оплате фрахта судовладельцу процентов за пользование чужими денежными средствами в размере долл. США 1.936-92, арбитры находят указанную просьбу обоснованной и подлежащей удовлетворению.

2.3. Что касается требования истца о взыскании расходов на ведение дела в размере долл. США 8.165-00, то, исходя из принципа разумности понесённых расходов и характера данного дела, арбитры считают возможным взыскать в пользу истца расходы на ведение дела в размере долл. США 2.500-00.

3. Одновременно с этим арбитры обращают внимание на то, что ответчики, надлежащим образом уведомлённые, но не явившиеся в заседание, добровольно лишили себя возможности оспаривания в заседании МАК предъявленных к ним требований.

4. В связи с изложенным арбитры находят иск компании «Дансинк Трейдинг Лтд.» к компании «Питсбург Файнэншл Инк.» подлежащим удовлетворению частично, а именно в сумме долл. США 38.798-22, с частичным возмещением компанией «Питсбург Файнэншл Инк.» истцу расходов по оплате арбитражного сбора.

### Резолютивная часть решения

На основании вышеизложенного Морская арбитражная комиссия

### Р Е Ш И Л А :

1. Взыскать с ответчика - компании «Питсбург Файнэншл Инк.» (Pitsburg Financial Inc.), Панама, Панама в пользу истца - компании «Дансинк Трейдинг Лтд.» (Dunsink Trading Ltd.), Роуд Таун, Британские Виргинские острова, в удовлетворение исковых требований долл. США 38.798-22 и в возмещение расходов по уплате арбитражного сбора долл. США 1.290-82, а всего, таким образом, долл. США 40.089-04.

В остальной части иска к компании «Питсбург Файнэншд Инк.» отказать.

В иске компании «Дансинк Трейдинг Лтд.», Роуд Таун, Британские Виргинские острова, к ООО «Транспортная компания «ВИЛИС», Москва, Россия, отказать.

2. Арбитражный сбор по настоящему делу установить в размере долл. США 1.500-00 и отнести его уплату на истца и компанию «Питсбург Файнэншл Инк.» пропорционально удовлетворённой и отказанной частям иска, а именно – на истца в сумме долл. США 209-18 и на ответчика – компанию «Питсбург Файнэншл Инк.» в сумме долл. США 1.290-82.

7

В уплату Морской арбитражной комиссии арбитражного сбора обратить аванс, внесённый истцом при подаче искового заявления.

Настоящее решение составлено и подписано в четырёх экземплярах, из которых один предназначен для хранения в делах Морской арбитражной комиссии, один – для истца и два – для соответчиков.

Арбитры:

И.А. Новиков                                                    А.Л. Маковский

Всего прошнуровано, пронумеровано и скреплено печатью

*9 (девять)* листов, включая обложку

Ответственный секретарь
Морской арбитражной комиссии
при Торгово-промышленной палате
Российской Федерации

Т.В.Каменская

*9*

# MARITIME ARBITRATION COMMISSION
## at the CHAMBER OF COMMERCE AND INDUSTRY OF
## THE RUSSIAN FEDERATION

# AWARD

in the case № 4/2007 concerning the claim of the company "Dunsink Trading Ltd.",

Road Town, Tortola,

British Virgin Islands, against the companies

"Pitsburg Financial Inc.", Panama, Panama, and "Vilis Cargo Ltd.,"

Moscow, Russia, for recovery

of 45.088-43 US dollars

Case No. 4/2007

**Maritime Arbitration Commission**

**at the Chamber of Commerce and Industry of the Russian Federation**

Moscow

January 22,  2008

## A W A R D

**in the case concerning the claim of the company "Dunsink Trading Ltd.," Road Town, Tortola, British Virgin Islands, against the companies "Pitsburg Financial Inc.," Panama, Panama, and "Vilis Cargo Ltd.," Moscow, Russia,**

**for recovery of 45.088-43 US dollars**

**The Maritime Arbitration Commission composed of:**

I.A.Novikov and A.L.Makovsky, arbitrators,

and N.E.Chartseva, reporter,

at its meeting of 24 December 2007,

considered the case concerning  the claim of the company "Dunsink Trading Ltd.," Road Town, Tortola, British Virgin Islands, against the companies "Pitsburg Financial Inc.," Panama, Panama, and "Vilis Cargo Ltd.," Moscow, Russia, for recovery of 45.088-43 US dollars

and heard the explanations of the

Representative of the claimant: I.A.Frolov (under the power of attorney).

Representatives of the co-respondents, duly notified of the time and place of the hearings, did not appear at the meeting.

### Circumstances of the case:

On 17 July 2007 the company "Dunsink Trading Ltd." (hereafter – the claimant) filed a claim to the Maritime Arbitration Commission against the companies "Pitsburg Financial Inc." and "Vilis Cargo Ltd." (hereafter – the co-respondents) for recovery of 45.088-43 US dollars. The following appeared from the statement of claim and Annexes hereto.

On 26 October 2006 the claimant (ship-owner) and the company "Pitsburg Financial Inc." (freighter) entered into a time charter contract on the "BALTIME 1039" form with regard to the vessel "Nikolai Sutyrin". The vessel was transferred to the freighter in accordance with acceptance-transfer certificate of 5 November 2006.

On 30 October 2006 the parties signed a supplement to the contract of 26 November 2006 specifying that all disputes arising out of the present contract should be settled by the Maritime Arbitration Commission at the Chamber of Commerce and Industry of the Russian Federation in conformity with its Rules and with the legislation of the Russian Federation.

Under the terms of the contract of 26 November 2006, the freighter was obliged to advance payment of freight charges every fifteenth day in the amount of 2.250-00 US dollars per day.

Besides that, the claimant asserted that on 26 October 2006 the company "Vilis Cargo Ltd." and the claimant entered, by means of an exchange of letters, into a contract of guarantee, pursuant to which the indicated co-respondent guaranteed full execution of the time charter by the company "Pitsburg Financial Inc." and committed itself to pay all the debts of this company to the claimant and to satisfy all the claims of the claimant immediately upon the receipt of a written demand from the latter.

Under the terms of the time charter contract, the freighter was obliged to advance the first payment of the freight and of the bunker oil located on the vessel for a period of 15 days within three banking days following the date of the receipt of the vessel, that is to say on 8 November 2006 (for the period between 15 November 2006 and 20 November 2006). Besides that, the freighter was obliged to pay for the entertainment expenses of the master of the vessel in the amount of 200-00 US dollars monthly. After the first payment, the freight was also due to be paid in advance for periods of 15 days, that is:

- on 20 November 2006 (for the period between 20.11.2006 and 05.12.2006);
- on 5 December 2006 (for the period between 05.12.2006 and 20.12.2006);
- on 20 December 2006 (for the period between 20.12.2006 and 04.01.2007).

The claimant asserted that the respondent – the company "Pitsburg Financial Inc." – fulfilled its obligations to pay for the freight improperly, whereby at the moment of filing of the statement of claim the indebtedness of the respondent in regard of the claimant amounted to 34.986-51 US dollars, which is proved by the bills presented by the ship-owner and by the final payment calculated by the ship-owner.

According to the claimant, the first payment was made by the freighter on 13 November 2006 (with a delay of 5 days), the second payment was made partially on 5 December 2006 (with a delay of 15 days) and partially on 14 December 2006 (with a delay of 24 days), the third payment was

made on 12 December 2006 (with a delay of 22 days). The fourth payment has not been made until now.

The claimant repeatedly sent letters to the co-respondents demanding them to pay for the freight. The co-respondents did not fulfill their obligations, however.

On 29 December 2006 the claimant sent a letter to the freighter notifying him that in case of non-payment of the freight the vessel would be withdrawn from the service of the freighter. Exercising this right, on 6 January 2007 the ship-owner withdrew the vessel from the freighter.

In addition to the sum of the main debt the claimant asked to recover from the co-respondents an interest for the use of peculated monetary funds. According to the information published in the "Bulletin of the Bank of Russia" ("Vestnik banka Rossii"), issue № 16 (960) of 28 March 2007, the average interest rate of the lending agencies in Russia for short-term credits constituted (in US dollars): in November 2006 – 8,5% per year (0,0236% per day); in December 2006 – 8,4% per year (0,0233% per day). Consequently, the claimant asserted that arrears of interest of the freighter for the use of peculated monetary funds constituted:

First payment: 62.103-00 US dollars x 0,0236 x 5/100 = 73-28 US dollars (where 62.103-00 US dollars is the sum of the freight, 0,0236 is the interest rate for one day, and 5 is the number of days overdue);

Second payment: 25.000-00 US dollars x 0,0236 x 15/100 = 88-50 US dollars (where 25.000-00 US dollars is the sum of the freight, 0,0236 is the interest rate for one day, and 15 is the number of days overdue);

8.950-00 US dollars x 0,0236 x 24/100 = 50-69 US dollars (where 8.950-00 US dollars is the sum of the freight, 0,0236 is the interest rate for one day, and 24 is the number of days overdue);

Third payment: 33.950-00 US dollars x 0,0233 x 22/100 = 174-02 US dollars (where 33.950-00 US dollars is the sum of the freight, 0,0233 is the interest rate for one day, and 22 is the number of days overdue);

Fourth payment: 33.950-00 US dollars x 0,0233 x 196/100 = 1.550-43 US dollars (where 33.950-00 US dollars is the sum of the freight, 0,0233 is the interest rate for one day, and 196 is the number of days overdue).

In total: 1.936-92 US dollars.

Besides that, the claimant entered into an agreement on the provision of legal services for the present case, pursuant to which, according to the claimant, his expenses for lawyer's fees amounted to 8.165-00 US dollars.

In view of the aforesaid, following articles 310, 363, 395 and 634 of the Civil Code of the Russian Federation, articles 198, 208 of the Code of Mercantile Navigation, para.2 of the Statute of

the MAC, subpara.3 of para.4, subpara.1 of para.6 of the Rules of the MAC, the claimant asked the Commission to recover from the Respondent the following sums:

- the sum of the main debt in the amount of 34.986-51 US dollars;
- the interest for the use of peculated monetary funds in the amount of 1.936-92 US dollars;
- expenses for lawyer's fees in the amount of 8.165-00 US dollars.
- expenses for the payment of the arbitration fee in the amount of 1.500-00 US dollars.

No comments concerning the statement of claim were received from the co-respondents.

By a letter of 24 September 2007 № 1800-4,5/1804 the MAC notified the claimant that the materials concerning the claim, which were sent to the respondent – the company "Pitsburg Financial Inc." – at the address indicated in the statement of claim, were returned by the courier service with a notice of absence of the recipient at that address, and asked the claimant to provide a more accurate address of the respondent.

By a letter of 30 October 2007 № 1800-4/203 the MAC also notified the claimant that the materials concerning the claim, which were sent to the respondent – the "Vilis Cargo Ltd." – at the address indicated in the statement of claim, were returned with a notice of expiry of the period of storage, and asked the claimant to provide a more accurate address of the indicated respondent.

At the MAC meeting of 24 December 2007 the representative of the claimant confirmed the claims. The representatives of the co-respondent did not appear at the meeting. Having established that the co-respondents had been duly notified of the time and place of the examination of the case, the arbitrators decided to examine the case in the absence of the representatives of the co-respondents.

In response to the question posed by the arbitrators, whether the "Vilis Cargo Ltd." is currently exercising its activities on the territory of the Russian Federation, the representative of the claimant clarified that the claimant had received on demand an extract from the Unified State Register, pursuant to which this company is registered in Moscow and is exercising its activities at the address indicated in the statement of claim.

The arbitrators paid attention to the fact that the claimant and the company "Pitsburg Financial Inc." entered into two contracts in regard of the motor ship "Nikolai Sutyrin" – the time charter of 26 October 2007 (box form) and the time-charter of 30 October 2006 with supplements (Rider Clauses). In response to the question, to which of these contracts does the guarantee letter of 26 October 2007 given by the "Vilis Cargo Ltd." to the claimant relate, the representative of the claimant explained that the claimant considered the time charters of 26 October 2007 and of 30 October 2007 as one contract and, accordingly, the guarantee letter should be interpreted as relating to both time charters.

14

In connection with the question of the arbitrators concerning the payment of the accounts, the representative of the claimant confirmed that the fourth account had not been paid at all (the ship-owner's invoice of 21.12.2006) and that the other accounts were paid off with delays.

In response to the question of the arbitrators, what does the sum of the main debt include (34.986-51 US dollars), the representative of the claimant explained that this sum included: the freight for the period between 20.12.2006 and 04.01.2007 (the ship-owner's invoice of 21.12.2006) – 33.950-00 US dollars, the sum due for the entertainment expenses of the master of the motor ship "Nikolai Sutyrin" – 411-30 US dollars, as well as the other expenses that, in view of the claimant, the freighter has to compensate him.

## Reasons for the award

The Maritime Arbitration Commission, having examined the materials of the case and having listened to the explanations of the representative of the claimant, established the following.

1.1 According to the para.42 of the time-charter (Part II), concluded by the claimant and the company "Pitsburg Financial Inc." on 30.10.2006, all disputes arising out of this contract shall be settled by the Maritime Arbitration Commission in accordance with its Rules and in conformity with the legislation of the Russian Federation. The award of the Commission is final and binding for both parties.

Pursuant to para.2 of the Statute of the MAC at the Chamber of Commerce and Industry of the Russian Federation (Annex II to the Law of the Russian Federation "On international commercial arbitration" of 07.07.1993), subpara.1 of para.1 of the Rules of the MAC at the Chamber of Commerce and Industry of the Russian Federation the Commission shall settle disputes arising from contractual and other civil law relationships in the area of merchant shipping.

The arbitrators hold that the claimant's demand with respect to the company "Pitsburg Financial Inc." relates to the above-mentioned disputes and is to be examined by the MAC.

1.2. As regards the co-respondent – the "Vilis Cargo Ltd." – there is no proof in the case confirming the existence of the legal relationship between the claimant and this co-respondent arising out the time charter of 30.10.2006 that is covered by the aforementioned arbitration clause. It follows from the guarantee letter of 26.10.2006 given by the "Vilis Cargo Ltd." to the claimant and contained in the materials of the case that the "Vilis Cargo Ltd." guaranteed to the claimant to pay all the debts of the company "Pitsburg Financial Inc." related to the execution of the time charter of 26.10.2006, but this letter does not indicate that the "Vilis Cargo Ltd." has any rights or obligations relating to the execution of the time charter of 30.10.2006.

Besides that, the claimant did not provide any proof of the fact that it, for its part, had expressed his consent to accept guarantees proposed by the "Vilis Cargo Ltd." in regard of the company "Pitsburg Financial Inc.".

Thus, on the basis of the existing proof the Maritime Arbitration Commission does not find grounds for the satisfaction of the claim against the "Vilis Cargo Ltd.".

This conclusion of the arbitral tribunal as to the absence of proof confirming the conclusion of the contract of guarantee is without prejudice to the right of the claimant to file a statement of claim against the "Vilis Cargo Ltd." on the basis of the arbitration clause contained in the guarantee letter of 26.10.2006 in the framework of a separate arbitration proceedings.

2.1. The main demand of the claimant consists in the recovery of 34.986-51 US dollars from the co-respondents. This sum includes: first, the freight for the operation of the motor ship "Nikolai Sutyrin" in the period between 20.12.2006 and 04.01.2007 – 33.950-00 US dollars; second, the entertainment expenses of the master of the motor ship "Nikolai Sutyrin" according to the time charter of 30.10.2006 – 411-30 US dollars, as well as the other expenses that, in view of the claimant, the freighter had to compensate him.

The arbitrators are of the view that the demand of the claimant with respect to the company "Pitsburg Financial Inc." in part concerning the recovery of the freight (33.950-00 US dollars) and the entertainment expenses of the master of the vessel (411-30 US dollars) is rightful and is confirmed by the materials of the case. As to the other expenses, the claimant did not provide sufficient proof attesting the obligation of the company "Pitsburg Financial Inc." to compensate the claimant for the indicated expenses.

2.2. Having examined the claimant's demand to recover from the co-respondents, in addition to the sum of the indebtedness related to the payment of the freight to the ship-owner, an interest for the use of peculated monetary funds in the amount of 1.936-92 US dollars, the arbitrators find this demand well-grounded and subject to satisfaction.

2.3 As to the claimant's demand concerning the recovery of the lawyer's fees in the amount of 8.165-00 US dollars, reasoning from the principle of the reasonableness of the expenses incurred and the character of the present case, the arbitrators consider it possible to recover for the benefit of the claimant the lawyer's fees in the amount of 2.500-00 US dollars.

3. At the same time the arbitrators pay attention to the fact that the respondents were duly notified but did not appear at the meeting and thus voluntarily deprived themselves of the opportunity to contest the claims presented against them at the MAC meeting.

4. In connection with the aforesaid, the arbitrators find that the claim of the company "Dunsink Trading Ltd." against the company "Pitsburg Financial Inc." has to be partially satisfied,

specifically in the amount of 38.798-22 US dollars, with partial compensation by the company "Pitsburg Financial Inc." to the claimant of the expenses for the payment of the arbitration fee.

## Operative part of the award

In view of the aforesaid, the Maritime Arbitration Commission

### DECIDED:

1. To recover from the respondent – the company "Pitsburg Financial Inc.," Panama, Panama – for the benefit of the claimant – the company "Dunsink Trading Ltd.," Road Town, Tortola, British Virgin Islands – 38.798-22 US dollars for the satisfaction of the claim and 1.290-82 US dollars for the compensation of expenses for the payment of the arbitration fee, and, thus, 40.089-04 US dollars in total.

To dismiss the rest of the claim against the company "Pitsburg Financial Inc."

To shelve the claim of the company "Dunsink Trading Ltd.," Road Town, Tortola, British Virgin Islands, against the "Vilis Cargo Ltd.," Moscow, Russia.

2. To set the arbitration fee for the examination of the present case at 1.500-00 US dollars and to apportion it between the parties according to the satisfied and to the dismissed parts of the claim, specifically: 209-18 US dollars shall be borne by the claimant and 1.290-82 US dollars shall be borne by the respondent – the company "Pitsburg Financial Inc."

To count the sum paid in advance by the claimant at the time of filing its statement of claim in the payment of the arbitration fee due to the Maritime Arbitration Commission.

The present award is composed and signed in four copies, one copy being designed for storing in the archives of the Maritime Arbitration Commission, one – for the claimant and two – for the co-respondents.

Arbitrators:

I.A.Novikov  [signature]               A.L.Makovsky [signature]

[Seal]: Maritime Arbitration Commission at the Chamber of Commerce and Industry of the Russian Federation, Moscow.

/7

Bound, numbered and sealed
9 (nine) pages, including cover


Executive secretary of
Maritime Arbitration Commission
At the Chamber of the Commerce and Industry
Of the Russian Federation, Moscow
[signature] T.V.Kamenskaya


[seal]: Maritime Arbitration Commission at the Chamber of Commerce and Industry of the Russian Federation, Moscow


**Текст документа переведен с русского языка на английский язык переводчиком КАДАГИДЗЕ ДАВИДОМ ЛЕВАНОВИЧЕМ.**


*Город Москва.*
*Двадцать третьего мая две тысячи восьмого года.*
Я, Савельев Александр Евгеньевич, нотариус г. Москвы, свидетельствую подлинность подписи, сделанной переводчиком **КАДАГИДЗЕ ДАВИДОМ ЛЕВАНОВИЧЕМ** в моем присутствии. Личность его установлена.

Зарегистрировано в реестре за № *3-9498*
Взыскано по тарифу: 100 рублей; за услуги: 400 рублей
Нотариус



Итого прошнуровано, пронумеровано
и скреплено печатью 18 (Восемнадцать) листов
Нотариус

